**JUDGE SWEET**

09 CV 8126

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
WISDOM MARINE LINES S.A.
366 Main Street
Port Washington, New York 11050
Tel: (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

RECEIVED
SEP 23 2009
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

WISDOM MARINE LINES S.A.,

                    Plaintiff,

        v.

DOPMAR SRL,

                    Defendant.
--------------------------------------------------------------X

09 CV _____ ( )

**VERIFIED COMPLAINT**

       Plaintiff WISDOM MARINE LINES S.A. (hereinafter "WISDOM"), by its

attorneys, Chalos, O'Connor & Duffy, as and for its Verified Complaint against the

Defendant DOPMAR Srl (hereinafter "DOPMAR"), alleges upon information and belief

as follows:

### JURISDICTION

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure, and falls under this Court's admiralty and

maritime jurisdiction pursuant to 28 U.S.C. § 1333. Additionally, this case falls within

the ambit of this Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that

the action arises under the Federal Arbitration Act, 9 U.S.C. § 1, *et. seq.*

### THE PARTIES

2.    At all times material hereto, Plaintiff WISDOM was and still is a foreign business entity duly organized and existing pursuant to the laws of Taiwan.

3.    Plaintiff WISDOM maintains an office and principal place of business at Rm. 111, 7th Fl., No. 237 Fu-Hsing S. Rd., Sec. 2, Taipei 106, Taiwan.

4.    At all times material hereto, Plaintiff WISDOM was, and still is, the owner, or disponent owner, of ocean-going vessels, including the M/V LIULANG WISDOM, and Plaintiff WISDOM charters its vessels out to others for the carriage of cargo in exchange for the payment of hire.

5.    At all times material hereto, Defendant DOPMAR was and still is a foreign business entity duly organized and existing pursuant to the laws of Italy.

6.    Defendant DOPMAR maintains an office and principal place of business at 40 Via Vittorio Veneto, Torre del Greco, Italy.

7.    At all times material hereto, Defendant DOPMAR was and is engaged in the business of trading and overseas shipping and Defendant DOPMAR charters vessels for this purpose.

### AS AND FOR A FIRST CAUSE OF ACTION
### FOR BREACH OF A MARITIME CONTRACT

THE MARITIME CONTRACT:

8.    On or about April 23, 2009, Plaintiff WISDOM, as owner of the MV LIULANG WISDOM, chartered the vessel to Defendant DOPMAR, as charterer, for a period of twelve (12) months, plus or minus 30 (thirty) days at charterers option, in exchange for the payment of hire at a rate of USD 8,700.00 per day. *See* Exhibit A.

9.    The Time Charter Party consists of a confirmed fixture recap based on a New York Produce Exchange Form for a Time Charter (commercially referred to as "NYPE 93") with additional riders attached. *See*, Exhibit A, Fixture Recap dated 23 April 2009.

10.    The hire for the charter of the M/V LUILANG WISDOM was to be paid in U.S. dollars every 15 days in advance. *See*, Exhibit A, NYPE form at Cl. 11.

11.    In accordance with the terms and conditions of the Time Charter Party, the parties agreed that any disputes arising under the maritime contract were to be arbitrated in London. *See*, Fixture Recap with change for Line 519 of the NYPE form.

12.    The Time Charter Party between Plaintiff WISDOM and Defendant DOPMAR is a maritime contract.

THE BREACH OF THE MARITIME CONTRACT:

13.    In accordance with the terms of the maritime contract, Plaintiff WISDOM delivered the MV LUILANGWISDOM to Defendant DOPMAR on or about May 15, 2009, in Piraeus, Greece.

14.    The Defendant DOPMAR breached the maritime contract by failing to pay the hire as required by the terms and conditions of the Time Charter.

15.    Specifically, the Defendant DOPMAR failed to make timely payment for the second and third hire periods, but those payments were ultimately made by a sub-charterer of the vessel, third party, Illora Associated SA in Euros, as opposed to U.S. dollars as required by the Time Charter Party.

3

16.     In breach of the maritime contract, the Defendant DOPMAR did not make any payment for the 4th hire period which was due to be paid on 29 June 2009.

17.     On 14 July 2009, the 5th hire payment became due and payable for the period 14 July 2009 to 29 July 2009.

18.     In breach of the maritime contract, the Defendant DOPMAR did not make any payment for the 5th hire period.

19.     On or about 22 July 2009, the Plaintiff WISDOM withdrew the M/V LUILANG WISDOM from the service of the Defendant DOPMAR.

20.     The Defendant DOPMAR is still in breach of the terms and conditions of the Time Charter Party for failure pay hire, and other amounts, that are due owing under the maritime contract.


DAMAGES FOR BREACH OF THE MARITIME CONTRACT:

21.     The Defendant DOPMAR owes the sum of $107,272.44 for its use of the M/V LUILANG WISDOM, and the damages claimed for breach of the Time Charter Party includes: a) an amount of $126,231.25 for non-payment of the 4th hire; b) an amount of $68,730.00 for non-payment of hire from July 14, 2009 until July 22, 2009, and other miscellaneous items, *i.e.* C/E/V and cleaning of holds; less, c) credits applied to bunker fuel from payments received from a sub charterer, CPM Corporation Limited. *See,* Exhibit B, Final Hire Statement dated 19-Aug-2009.

22.     Despite demand, the amount referred to in ¶ 21 herein remains due and owing from Defendant DOPMAR to Plaintiff WISDOM, and the Defendant DOPMAR is in continuing breach of the maritime contract for failing to pay the Final Hire.

## PLAINTIFF IS INITIATING ARBITRATION
### PROCEEDINGS AGAINST DEFENDANT IN LONDON

23.     In accordance with the terms and conditions of the maritime contract,
specifically clause 45, Plaintiff WISDOM and Defendant DOPMAR agreed to resolve
any disputes arising under the maritime contract by arbitration in London with English
law to apply. *See* Exhibit A at Recap.

24.     In accordance with the agreement to arbitrate any disputes arising under
the maritime contract, Plaintiff WISDOM is, or is preparing to, initiate arbitration
proceedings against Defendant DOPMAR in London to recover its damages for
Defendant DOPMAR's breach of the maritime contract.

## THE DAMAGES SOUGHT
### FOR BREACH OF THE MARITIME CONTRACT

25.     Under English law, including but not limited to § 63 of the English
Arbitration Act of 1996 and/or the London Maritime Arbitration Association's rules,
costs, including solicitor' fees, arbitrator's fees, disbursements and interest are
recoverable damages in arbitration and such damages are routinely awarded to the
prevailing party in London arbitration held pursuant to English law.

26.     As best as can now be estimated, Plaintiff WISDOM expects to recover
the following amounts in London arbitration from Defendant DOPMAR:

| | | |
|---|---|---|
| A. | Principal claim | $107,272.44 |
| B. | Estimated interest on claims: 3 years at 7.5%, compounded quarterly | $ 26,787.69 |
| C. | Estimated solicitor's fees: | $ 50,000.00 |

D.    Estimated arbitration costs/expenses:      $ 20,000.00

**Total Claim:**                                    **$204,060.13**

### PRAYER FOR RELIEF

27.    Notwithstanding the fact that the liability of Defendant DOPMAR for the alleged breaches of the maritime contract, as set forth herein, is subject to determination by arbitration in London, there are now, or will be during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits, effects, payments for goods or services, bills of lading, cargo and the like belonging to or claimed by the Defendant within this District and held by various parties, as garnishees.

28.    Plaintiff WISDOM has sufficient reason to believe that Defendant DOPMAR's tangible or intangible personal property or other assets, *to wit*: bank accounts; payments of freight and/or hire in U.S. dollars to other vessel Owners from the Defendant and payments of U.S. dollars to the Defendant from third party Owners of cargo, vendors and/or suppliers; and/or Clearing House Interbank Payment System (CHIPS) credits; and/or operational funds being transferred through intermediary banks in the for of electronic payment transfers (i.e. "EFT"s) are located in this District in the possession of several garnishees and said garnishees are enumerated in the proposed Process of Maritime Attachment and Garnishment.

29.    The Plaintiff WISDOM states as grounds for the statements set forth in ¶s 27 and 28 herein that it has been recently reported in Lloyd's List that the Defendant DOPMAR recently, on or about July 2, 2009, time chartered two additional vessels known as the M/V OCEAN STAR and M/V BLUE STAR, and the report noted the

payments for those vessels were quoted in U.S. dollars, such that there is a reasonable belief that the Defendant DOPMAR is still trading in U.S. dollars and it is making or receiving payments in U.S. dollars on a regular basis, all of which are processed by intermediary banks located in this district. Further, payments in this matter have been made on behalf of Defendant DOPMAR in US Dollar transactions that have travelled through Citibank in New York.

30.      As set forth in the accompanying Declaration of George E. Murray, Defendant DOPMAR cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure. *See,* Exhibit C.

31.      Because this Verified Complaint sets forth an *in personam* maritime claim against Defendant DOPMAR, because Defendant DOPMAR cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure, because the Plaintiff has reason to believe that the property of the Defendant may be found in this District and because there is no statutory or maritime bar to an attachment, the requirements for the issuance of Rule B Process of Maritime Attachment and Garnishment are met.

32.      The Plaintiff seeks the issuance of process of maritime attachment so that it may obtain security for its claims against Defendant DOPMAR and/or *quasi in rem* jurisdiction over the property of the Defendant so that an eventual arbitration award and/or judgment confirming the arbitration award can be satisfied.

7

WHEREFORE, Plaintiff prays as follows:

A. That the Defendant DOPMAR be summoned to appear and answer this Verified Complaint;

B. That Defendant DOPMAR not being found within this District, as set forth in the Declaration of George E. Murray, then all of their tangible and intangible property, including assets, accounts, freights, monies, charter hire, credits, effects, payment for goods or services, bills of lading, cargo, raw materials and the like belonging to or claimed by the Defendant, within this District up to the amount sued for herein be attached pursuant to Supplemental Rule B and restrained by the garnishees of the Defendant to pay the Plaintiff's damages;

C. That this Court retain jurisdiction over this matter through the entry of an arbitration award by an arbitration tribunal in London and/or, if necessary, a judgment from this Court confirming the award of the London arbitration tribunal so that judgment may be entered in favor of Plaintiff WISDOM for the amount of its claim with costs, *i.e.* **$204,060.13**, and that a judgment of condemnation and sale be entered against the property restrained and attached herein in the amount of Plaintiff's claim, plus costs to be paid out of the proceeds thereof; and

D. That Plaintiff has such other and further relief as the Court may determine to be just and proper under the circumstances.

8

Dated: Port Washington, New York
    September 23, 2009

                      CHALOS, O'CONNOR & DUFFY, LLP
                      Attorneys for Plaintiff,
                      WISDOM MARINE LINES S.A.

By: _____
                      George E. Murray (GM 4172)
                      Owen F. Duffy (OD 3144)
                      366 Main Street
                      Port Washington, New York 11050
                      Tel:  (516) 767-3600
                      Fax:  (516) 767-3605

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, George E. Murray, declares under the penalty of perjury:

1.    That I am an associate at the law firm of Chalos, O'Connor & Duffy LLP, counsel for the Plaintiff, WISDOM MARINE LINES S.A., herein;

2.    That I have read the foregoing complaint and know the contents thereof;

3.    That I believe the matters to be true based on documents and information obtained from employees and representatives of the Plaintiff through its agents, underwriters and attorneys; and

4.    That the reason that this verification was made by deponent and not by the Plaintiff is because the verification of the officers of Plaintiff could not be obtained within the time constraints presented by the circumstances of this case.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: Port Washington, New York
       September 23, 2009

                          CHALOS, O'CONNOR & DUFFY, LLP
                          Attorneys for Plaintiff,
                          WISDOM MARINE LINES S.A.

         By:    _____
                George E. Murray (GM-4172)
                Owen F. Duffy (OD-3144)
                366 Main Street
                Port Washington, New York 11050
                Tel:  (516) 767-3600
                Fax:  (516) 767-3605
                Email: gmurray@codus-law.com

# EXHIBIT A

Elstub Charles

| | |
|---|---|
| From: | Wisdom Marine Lines S.A. (Chartering) [chartering@wisdomlines.com.tw] |
| Sent: | 23 April 2009 02:26 |
| To: | Wisdom Marine Lines (Operations Dept) |
| Subject: | FW: Fixture confirmation / Lulfang Wisdom / Dopmar Srl. Italy |
| Attachments: | 5.jpg; 6.jpg; 7.jpg; 9.jpg; 10.jpg; 11.jpg; 12.jpg; 13.jpg; 14.jpg; 15.jpg; 17.jpg; 18.jpg; 19.jpg; 21.jpg; 22.jpg; 23.jpg; 24.jpg; 25.jpg; 4.jpg; Wisdom Proforma CP.pdf; Wisdom Proforma Rider Clause.pdf |

Dear Ching-I,

Re: Lulfang Wisdom / Dopmar Srl. Italy

Below fyi.

Brg
Mike Chao

From: Farum Shipping ApS [mailto:chartering@farumship.dk]
Sent: Thursday, April 23, 2009 12:27 AM
To: Chartering
Subject: Fw: Fixture confirmation

*Farum Shipping Aps - Copenhagen*
PH.: +45 4495 4600 - Fax: +45 4495 4636
Mail: chartering@farumship.dk

Mike / Kurt

received the following from chrtrs brokers:

Good day

To all concerned parties

As per your mutual authority we can confirm having fully fixed as follows

MV Lulang WISDOM

ST SD BC
ITF/WW/AUSSIE/GRAIN/SLVENT FTD
ABT 22782 MTS DWAT ON ABT 9.91 SW DRAFT
PANAMA FLAG/BLT 1985 LOA 157.26/BEAM 23.0 M
O/B 959,383/913,383 CF
4X35 MTS CR-4 HO/HA
HA DIMS NO1 12.8X10.8 NO 2+4 19.2 NO 3 24.8 X 12.4 M

03/06/2009

⑤

FIXED STANCHIONS ON DECK PORT AND STARBOARD
IN THE WAY OF MASTHOUSES

ABT 13.0 KN ON ABT 16..5 MT IFO 180 CST RMB 25 + 1.6 DMB
PORT CONS 1.6 MT DMB/2.5 MTS DMB GEAR WORKING

THE ABV SPD/CONS IS BSS GOOD WEATHER CONDITION,NO ADVERSE CURRENT,NO
NEGATIVE INFLUENCE OF SWELLS AND NOT EXCEEDING BEAUFORT SCALE FORCE 4
AND DOUGLASS SEA STATE 3

VSL BURNS MDO FOR MANOEUVERING/NAVIGATING IN CONFINED/RESTRICTED
WATERS/CANALS/RIVERS AND IN/OUT OF PORTS/LOCKS ETC

BUNKERS SPECS TO CONFORM TO ISO 8217 2005(E) AND ANY AMENDMENTS
THERETO,QUALITY MAX 180 CST,RMB 180 FOR IFO AND DMB FOR MDO AND TO
COMPLY WITH MARPOL 73/78 ANNEX VI REGULATION 14.

ALL DTLS ABT

subject successful delivery of vessel from seller. ( this is just
formality, please be noted we have paid the 20% deposit already, but as
you are aware of the shipping market, anything can happen; should there
be any trouble from the seller that we can not have control of, trust
chtrs would understand)

Owners guarantee the vessel is fully classed pandi covered ism isps itf
compliant and shall remain like that for the entire duration of this
time charter

For account of Jophar srl

Laycan: 1-30 May intended delivery from seller on around 4th May, owners
need about 2-3 days for ship ready, any way, will keep update the
soonest.

Delivery on DOP sp within Mediterranean, port in on (intended PIRABUS,
(RBBCB)

Duration 12 mos +/- 30 days in chopt

Hire usd 8700 pdpr inclot

Cve usd 1250 pm/pr

Ilohc usd 3000

Otherwise as per owners' charter party as attached less 2.5 pct address
commission and 1.25 pct to mare nostrum srl + 1.25 pct farum

apart from

Line 121 after "specifications" add "any such claim to be always made in

03/06/2009

accordance with the terms and conditions of the specific bunker
supplier, for each bunker call chrts will make sure owners get a copy of
the supplier's terms and conditions upon fixing"

Line 433 cleaning of holds

Delete "charterers direct negotiation with crews" and insert "usd 500
per hold, directly to the owners together with hire invoice, said amount
to be included in the invoice".

Line 519 arbitration in "London" delete "Singapore"

Additional clauses

Cl 46
Add at the end "any claim to be made in accordance with the specific
supplier terms and conditions".

Cl 49 cargo exclusions
Delete
cement in bulk
after "scrap" add "shredded scrap to be allowed however soft loading
clause to apply (same as for pig iron)"
Cement in bulk and shredded scrap to also be included as dirty cargo,
sulphur cargo loading to be subject to local port regulation (we have
noticed that some port require IMBC/IMDG to load this cargo)

number of dirties allowed delete "1" and insert "4" BUT NOT FOR THE LAST
VOYAGE.

Cl 50 trading limits/exclusions
Reinstate "charterers option NAABSA" and add "where customary of the
trade" Delete from the exclusions Angola and Libya
Delete "but Iraq will be allowed as soon as situation normalizes" and
Insert "Iraq to be allowed however any extra premium for war risk
insurance to be for charterers account". Angola, Libya, Iraq allowed
subject to hull underwriter's approval and additional premium if any to
be chtrs acct.

Cl 60
Add at the end
"Should owners decide to sell the vessel charterers to be informed of
any such decision before the vessel gets officially marketed and be
given first refusal on the sale".

Cl 65
Add at the end
Should any off hire occur during the last three months of this charter
party charterers to have the right do add same to the duration of this
period and same option to be declared wi 48 hrs of the vessel coming
back on hire after any such occurrence.

Cl 68
as per cp but add at the end "In case lol for discharging without
presentation of original b/l is needed owners to be made aware of that

03/06/2009

7

during negotiation with sub charts whom to be approved by owners, said
approval not to be unreasonably withheld. Should a situation arise where
the bs/l shall not be available at disport and same not known during the
negotiation and only in case charterers are not acceptable to the owners
(once again approval not to be unreasonably withheld) owners have the
right to request for the lol to be accompanied by a first class bank
guarantee.

Cl 88
Line 8 after "situation" add "as soon as possible but latest"

Add at the end
"As long as the lower sale price does not exceed the cost of the
repairs, should any dispute arise on the evaluation of the damage same
to be established as the average between two quotes coming from one
shipyard in the feast and another one in turkey".
End


Pleased to hear
Brgds




_____ Information from ESET NOD32 Antivirus, version of virus signature database 3944
(20090317) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com


_____ Information from ESET NOD32 Antivirus, version of virus signature database
3944 (20090317) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com


_____ Information from ESET NOD32 Antivirus, version of virus signature database
3968 (20090327) _____


03/06/2009

8

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

03/06/2009

9

Code Name: "NYPE 93"

Recommended by:
The Baltic and International Maritime Council (BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)

# TIME CHARTER©

New York Produce Exchange Form
Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.

November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th, 1993

| | |
|---|---|
| THIS CHARTER PARTY, made and concluded in | 1 |
| This            day of                          20 | 2 |
| | 3 |
| Between | 4 |
| | 5 |
| Owners of the Vessel described below, and | 6 |
| | 7 |
| | 8 |
| Charterers. | 9 |
| Description of Vessel | |
| Name                    Flag               Built              (year). | 10 |
| Port and number of Registry | 11 |
| Classed                                    in | 12 |
| Deadweight            long*/metric* tons (cargo and bunkers, including freshwater and | 13 |
| stores not exceeding    long*/metric* tons) on a salt water draft of | 14 |
| on summer freeboard. | 15 |
| Capacity               cubic feet grain          cubic feet bale space. | 16 |
| Tonnage               GT/GRT. | 17 |
| Average speed about       knots, fully laden, in good weather conditions up to and including maximum | 18 |
| Force 4 on the Beaufort wind scale and / or Douglas Sea State 3, on a consumption of about   long*/metric* | 19 |
| tons of | 20 |
| | 21 |
| | 22 |
| For further description   ( SEE CLAUSE 46) | 23 |

## 1. Duration

| | |
|---|---|
| The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period | 24 |
| Of | 25 |
| | 26 |
| | 27 |
| | 28 |
| within below mentioned trading limits. | 29 |

## 2. Delivery

| | |
|---|---|
| The Vessel shall be placed at the disposal of the Charterers at | 30 |
| | 31 |
| In such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide) as the | 32 |
| Charterers may direct.   The Vessel on arrival first load port | 33 |
| shall be ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted | 34 |
| for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear | 35 |
| simultaneously. | 36 |
| | |
| The Owners shall give the Charterers not less than 20,15,7,5 and 3 apprx days notice of expected date of | 37 |

24

delivery. 38

And 2 and 1 day of definite notice of date and time and place for delivery. 39

3. ~~On-Off Hire Survey~~ 40

~~Prior to delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors, for their~~ 40
~~respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct~~ 41
~~joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition~~ 42
~~of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without~~ 43
~~prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.~~ 44
~~If either party fails to have a representative attend the survey and sign the joint survey report, such party~~ 45
~~shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.~~ 46
~~On hire survey shall be on Charterers' time and off hire survey on Owners' time.~~ 47

4. Dangerous Cargo/Cargo Exclusions 48

(a) The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous, 49
injurious, flammable or corrosive nature unless carried in accordance with the requirements or 50
recommendations of the competent authorities of the country of the Vessel's registry and of ports of 51
shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must 52
pass. Without prejudice to the generality of the foregoing, in addition the following are specifically 53
excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials, 54
55

(ALSO SEE CLAUSE 49) 56
57
58
59
60
61
62
63
64

~~(b) If IMO-classified cargo is agreed to be carried, the amount of such cargo shall be limited to~~ 65
~~tons and the Charterers shall provide the Master with any evidence he may~~ 66
~~reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO~~ 67
~~regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at~~ 68
~~the Charterers' risk and expense.~~ 69

5. Trading Limits 70

The Vessel shall be employed in such lawful trades between safe ports and safe places 71
Within    (SEE CLAUSE 50) 72
73
excluding 74
75
as the Charterers shall direct 76
77

6. Owners to Provide 77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for 78
all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; shall pay for 79
wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the 80
crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and 81
equipment for and during the service. 82

7. Charterers to Provide 83

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise 84
agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory 85
garbage disposal), all communication expenses pertaining to the Charterers' business at cost, pilotages, 86

25

towages, agencies, commissions, consular charges (except those pertaining to individual crew members | 87
or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel | 88
puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all | 89
such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew | 90
shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while | 91
the Vessel is employed under this Charter Party shall be for the Charterers' account. All other fumigations | 92
shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six | 93
months or more. | 94

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a | 95
special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already aboard | 96
the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost and in | 97
their time.  Local agent(s) appointed and employed by charterers is responsible to retrieve information | 
from the vessel and to report/file all necessary information to the local/port authority.  In no case will | 
owners / vessel be held liable for the failure of insufficient reporting / filing unless master has failed to | 98
furnish the specific information requested by agent(s). | 

**8. Performance of Voyages** | 99

(a) The Master shall perform the voyages with due despatch, and shall render all customary assistance | 100
with the Vessel's crew. The Master shall be conversant with the English language and (although | 101
appointed by the Owners) shall be under the orders and directions of the Charterers as regards | 102
employment and agency; and the Charterers shall perform all cargo handling, including but not limited to | 103
loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk | 104
and expense, under the supervision of the Master. | 105

(b) If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or | 106
officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if | 107
necessary, make a change in the appointments at a convenient port. | 108
| 109

**9. Bunkers** | 

(a) Bunkers on delivery to be as on board and the prices of bunkers to be at the Owners' purchase | 110
Price, and bunkers on redelivery to be abt same quantity as delivery and the prices of bunkers to be at the | 111
Charterers' purchase price at the last bunkering port.   The Charterers have the privilege to bunker the vessel | 112
Prior to delivery, provided the bunkering does not interfere with the Owners'/Builder's operation, if interfered time | 113
lost to be for the Charterers' account.   Similar privilege is granted to the Owners prior to redelivery. | 114
| 115
| 116
| 117

(b) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines | 
and auxiliaries and which conform to the specification(s) as set out in CLAUSE 46 | 118

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines | 119
or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed | 120
specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed | 121
specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners | 122
shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker | 123
consumption, nor for any time lost and any other consequences. | 124
| 125

**10. Rate of Hire/Redelivery Areas and Notices** | 

The Charterers shall pay for the use and hire of the said Vessel at the rate of $ | 126
U.S. currency, daily, or $ ~~U.S. currency per ton on the Vessel's total deadweight~~ | 127
~~carrying capacity, including bunkers and stores, on summer freeboard, per 30 days,~~ | 128
commencing on and from the day of her delivery, as aforesaid, and at end after the same rate for any part | 129
of a day month; hire shall continue until the hour of the day of her redelivery in like good order and condition, | 130
ordinary wear and tear excepted, to the Owners (unless Vessel lost) at   Far East Area including Japan and | 131

26

Singapore range,

unless otherwise mutually agreed.
The Charterers shall give the Owners not less than 30, 15, 7, 5 and 3 apprx days notice of the Vessel's
expected date and 2 and 1 day of definite notice of date and time and probable port of redelivery.

For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be
adjusted to UTC.

## 11. Hire Payment

### (a) Payment

Payment of Hire shall be made to the Owners' nominated bank in Taipel in United States currency
(SEE CLAUSE 63)

15 days in advance, and for the last 15 days or part of same the approximate
amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,
or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)
may otherwise have on the Charterers.

At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the
hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold
the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever
for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire
shall continue to accrue and any extra expenses resulting from such withholding shall be for the
Charterers' account.

### (b) Grace Period

Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners
2 clear banking days from the original hire due date   to rectify the
failure, and when so rectified within those 2 days following the original hire due date , the payment shall
stand as regular and punctual.

Failure by the Charterers to pay the hire within 2 days of the original hire due date as
provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (a) above.

### (c) Last Hire Payment

Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate
payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and
the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking
into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for
the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the
balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be
refunded by the Owners or paid by the Charterers, as the case may be.

### (d) Cash Advances

Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required
by the Owners, subject to 2½ percent commission in total and such advances shall be deducted from the hire.
The Charterers, however, shall in no way be responsible for the application of such advances.

132
133
134
135
136
137
138
139
140
141
142
143
144
145
146
147
148
149
150
151
152
153
154
155
156
157
158
159
160
161
162
163
164
165
166
167
168
169
170
171
172
173
174
175
176
177
178

## 12. Berths

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that
Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat
at any time of tide. Master has the sole right to refuse to enter any port, berth or place that deem unsafe by his
discretion;   it is charterers' responsibility to provide sufficient information and evidence to show such port,
berth, and or place is proven safe before owners will grant the entering of vessel to such port, berth, place,
And the vessel is to remain on hire at full time.

## 13. Spaces Available

(a) The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the
Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,
apparel, furniture, provisions, stores and fuel.

(b) In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the
Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a
result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.   (SEE
CLAUSE 52)

## 14. Supercargo and Meals

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers'
risk and see that voyages are performed with due despatch. He is to be furnished with free
accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of
$15.                                    per day. The Owners shall victual pilots and customs officers, and also, when
authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,
Charterers paying at the rate of    AS PER   CLAUSE 53   per meal for all such victualling.

## 15. Sailing Orders and Logs

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing
directions, in writing, in the English language, and the Master shall keep full and correct deck and engine
logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the
Charterers, their agents or supercargo, when required, with a copy of abstract Logs of which formats to be
supplied by Charterers,
showing the course of the Vessel, distance run and the consumption of bunkers.

## 16. Delivery/Cancelling

If required by the Charterers, time shall not commence before                              and should the
Vessel not be ready for delivery on or before                     but not later than              hours,
the Charterers shall have the option of cancelling this Charter Party.

### Extension of Cancelling

If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready
for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty
the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is
expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will
cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two
days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date
of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the
Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers in
accordance with this Clause.

## 17. Off Hire

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the

179
180
181

182

183
184
185
186
187

188
189
190

191
192
193
194
195
196
197

198
199
200
201

202
203
204

205
206
207
208

209

210
211
212
213
214
215
216
217
218

219
220
221

28

arrest of the Vessel, (unless aforesaid events is caused by events for which the Charterers, their servants,  222
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless  223
resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or  224
painting bottom, or by any other similar cause preventing the full working of the Vessel (other cause refers to
the one(s) directly affect the efficient running of the vessel and exclude external events which , while delaying  225
performance of contract , do not relate to the physical condition of the vessel or crew )the payment of
hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back  226
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident  227
to the cargo or where permitted in lines 267 to 268 hereunder, the hire is to be suspended from the time  228
of her deviating or putting back until she is again in the same or equidistant position from the destination  229
and the voyage resumed there from ( except for any rescue operation ordered by any Government or  230
similar authority of its kind). All bunkers used by the Vessel while off hire shall be for the Owners'
account. In the event of the Vessel being driven into port or to anchorage through stress of weather,  231
trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses  232
resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be  233
reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and  234
the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses directly  235
incurred may be deducted from the hire.  236

237

18. Sublet  238

Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of  239
the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this  240
Charter Party.

19. Drydocking   (SEE CLAUSE 67)  241

~~The Vessel was last drydocked~~  242

~~*(a) The Owners shall have the option to place the Vessel in drydock during the currency of this Charter~~  243
~~at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for~~  244
~~bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~  245

~~*(b) Except in case of emergency no drydocking shall take place during the currency of this Charter~~  246
~~Party.~~  247

~~* Delete as appropriate~~  248

249

20. Total Loss  249

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or  250
being last heard of) shall be returned to the Charterers at once.   The act of God, enemies, fire, restraint of
Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam  251
Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

252

21. Exceptions  253

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the  254
seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always  255
mutually excepted.

22. Liberties  256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels  257
in distress, and to deviate for the purpose of saving life and property.  258

259

23. Liens  259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due  260
under this Charter Party, including general average contributions, and the Charterers shall have a lien on  261
the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be  262

29

returned at once.                                                                              283

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance,     284
which might have priority over the title and interest of the Owners in the Vessel. The Charterers             265
undertake that during the period of this Charter Party, they will not procure any supplies or necessaries      266
or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.       267

                                                                                              268

### 24. Salvage

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting           269
Owners' and Charterers' expenses and crew's proportion.                                        270

                                                                                              271

### 25. General Average

General average shall be adjusted according to York-Antwerp Rules 1994, ~~1974 as amended 1990~~, or any      272
subsequent modification thereof,   in London and settled in US Dollars                         273

                                                                                              274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will    275
contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules      276
1974, as amended 1990, or any subsequent modification thereof and will include the "New Jason                 277
Clause" as per Clause 31.

Charterers are obligated to assist owners obtaining security from cargo receivers.              278

Time charter hire shall not contribute to general average.                                     279

                                                                                              280

### 26. Navigation

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners          281
shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance. Extra war risk
insurance be paid by Charterers immediately upon presentation of vouchers otherwise as Clause 5 of            282
the Charter Party.   Charterers to pay extra crew war bonus, crew insurance, if any
and all other matters, same as when trading for their own account.                             283

                                                                                              284

### 27. Cargo Claims


Ultimate responsibilities as between owners and charterers for all cargo claims arising out of charter voyages
shall be settled in accordance with Inter-Club New York Produce Exchange Agreement dated 20th Feb 1970
and reprint of May 1972 and reprint of May 1984 and revised September 1996 and any subsequent
amendment which terms are indemnity Club is , in fact , covering either Owners and Charterers.

Owners agree that provided they are kept regularly advised by Charterers of all claims, settlements and        285
extension of time, the Charterers may deal with and handle all cargo claim arising of charterer voyage and with
owners' agreement, may settle cargo claims upto a limit of US$1000.00 per claim and grant extension of time
as against owners and charterers in respect of all claims not yet time barred.

Owners shall bear no responsibility for damages to the cargo which caused due to bad handling of the
Stevedores.                                                                                   286

### 28. Cargo Gear and Lights

The Owners shall maintain the cargo handling gear of the Vessel as fitted,                      287
                                                                                              288
                                                                                              289
                                                                                              290
providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also    291

30

provide on the Vessel for night work lights as on board, but all additional lights over those on board shall · 292
be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If · 293
required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the · 294
Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or · 295
insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that · 296
time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned · 297
thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If · 298
required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which · 299
case the Vessel shall remain on hire. · 300

29. Crew Overtime (SEE CLAUSE 55) · 301

~~In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents,~~ · 302
~~the Charterers shall pay to owners, concurrently with the hire~~ ————————————— ~~per month~~ · 303
~~or pro rata.~~ · 304

30. Bills of Lading · 305

(a) The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates · 306
or tally clerk's receipts. However, the Charterers may sign bills of lading or waybills on behalf of the · 307
Master, with the Owner's prior written authority, always in conformity with mates or tally clerk's receipts. · 308

(b) All bills of lading or waybills shall be without prejudice to the Charter Party and the Charterers shall · 309
indemnify the Owners against all consequences or liabilities which may arise from any inconsistency · 310
between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master · 311
at their request. · 312

(c) Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and · 313
Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for · 314
any loss, damage, expense or delay howsoever caused.'   General deck cargo clause to be incorporated in B/L
covering deck cargo.   (SEE ALSO CLAUSE 82)

(d) When loading bulk cargo, the cargo quantity must accord to the draft survey agreed by master.   And the · 315
mate's receipt should be remarked as ' Cargo weight and condition unknown', the vessel is not responsible for
the quality and or quantity."

31. Protective Clauses · 316

This Charter Party is subject to the following clauses all of which are also to be included in all bills of lading · 317
or waybills issued hereunder: · 318

(a) CLAUSE PARAMOUNT · 319
"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the · 320
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national · 321
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall · 322
be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the · 323
carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said · 324
applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such · 325
term shall be void to that extent, but no further." · 326

and · 327

(b) BOTH-TO-BLAME COLLISION CLAUSE · 328
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any · 329
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in · 330
the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against · 331
all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents · 332
loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other · 333
or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the · 334

31

other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.                    335

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or    336
objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or    337
contact."    338

and    339

(c) NEW JASON CLAUSE    340
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage    341
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the    342
consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods,    343
shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the    344
payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred,    345
and shall pay salvage and special charges incurred in respect of the goods.    346

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship    347
or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover    348
the estimated contribution of the goods and any salvage and special charges thereon shall, if required,    349
be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."    350

and    351

(d) U.S. TRADE - DRUG CLAUSE    352
"In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof, the    353
Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested    354
narcotic drugs and marijuana to be loaded or concealed on board the Vessel.    355

Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences    356
of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel    357
harmless and shall keep them indemnified against all claims whatsoever which may arise and be made    358
against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines,    359
as a result of the Charterers' breach of the provisions of this clause shall be for the Charterers' account    360
and the Vessel shall remain on hire.    361

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this    362
clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable    363
time the Vessel is released and at their expense put up the bails to secure release of the Vessel.    364

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the    365
event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the    366
Vessel's personnel."    367

and    368

(e) WAR CLAUSES    369
"(i) No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the    370
Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state    371
of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration    372
of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture,    373
seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de    374
facto authority or any purported governmental organization maintaining naval, military or air forces).    375

(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring    376
the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not    377
exceeding a valuation of                in addition, the Owners may purchase and the    378
Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements,    379
total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a    380
government program, the Vessel shall not be required to enter or remain at any such port or zone.    381

32

(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter, or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such port or zone assume the provable additional cost of wages and insurance properly incurred in connection with master, officers and crew as a consequence of such war, warlike operations or hostilities.

(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the Charterers' account."

## 32. War Cancellation

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or more of the following countries: Fed. Rep. Russia / P.R.C. /U.S.A. / E.U. country

either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she then is; or, if at sea, at a near open and safe port as directed by the Owners, in all cases hire shall continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this Charter Party shall apply until redelivery.

## 33. Ice

The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and remain in the port or area or to get out after having completed loading or discharging. Subject to the Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her size, construction and ice class.

## 34. Requisition

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid by the said government in respect of such requisition period shall be retained by the Owners. The period during which the Vessel is on requisition to the said government shall count as part of the period provided for in this Charter Party.
If the period of requisition exceeds 30 days, either party shall have the option of cancelling this Charter Party and no consequential claim may be made by either party.

## 35. Stevedore Damage (SEE ALSO CLAUSE 88)

Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their agents in writing as soon as practical but not later than 48 hours after any damage is discovered. Such notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent of such damage.

(a) In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed and if required passed by the Vessel's classification society.

(b) Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option, before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the Owners' work.

382
383
384
385
386
387
388
389
390
391
392
393
394
395
396
397
398
399
400
401
402
403
404
405
406
407
408
409
410
411
412
413
414
415
416
417
418
419
420
421
422
423
424
425
426
427
428
429
430

33

### 36. Cleaning of Holds

The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between
voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by
Local regulations, at the rate of    Charterers direct negotiation with crews. All cleaning materials, supplies
including fresh water required for such cleaning to be on charterers' account.
In connection with any such operation, the Owners & vessel shall not be responsible if the Vessel's holds are
not
accepted or passed by the port or any other authority. The Charterers shall have the option to re-deliver
the Vessel with unclean/unswept holds against a lump sum payment of $3,500.                  in lieu of cleaning.

### 37. Taxes

Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners
resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter
Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding
taxes levied by the country of the flag of the Vessel or the Owners).

### 38. Charterers' Colors

The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their
own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter
Party. Cost and time of painting, maintaining and repainting these changes effected by the Charterers
shall be for the Charterers' account.

### 39. Laid up Returns

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their
underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum
period of 30 days if on full hire for this period or pro rata for the time actually on hire.

### 40. Documentation

The Owners shall provide any documentation relating to the Vessel that may be required to permit the
Vessel to trade within the agreed trade limits, including, but not limited to certificates of financial
responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners'
P & I club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate
of registry and certificates relating to the strength and/or serviceability of the Vessel's gear.

### 41. Stowaways

(a) (i)   The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining
          access to the Vessel by means of secreting away in the goods and/or containers shipped by the
          Charterers.

     (ii)  If, despite the exercise of due care and diligence by the Charterers, stowaways have gained
           access to the Vessel by means of secreting away in the goods and/or containers shipped by the
           Charterers, this shall amount to breach of charter for the consequences of which the Charterers
           shall be liable and shall hold the Owners harmless and shall keep them indemnified against all
           claims whatsoever which may arise and be made against them. Furthermore, all time lost and all
           expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account
           and the Vessel shall remain on hire.

     (iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to
           sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a
           reasonable time, the Vessel is released and at their expense put up bail to secure release of the
           Vessel.

(b) (i)   If, despite the exercise of due care and diligence by the Owners, stowaways have gained
          access to the Vessel by means other than secreting away in the goods and/or containers shipped
          by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including

34

fines, shall be for the Owners' account and the Vessel shall be off hire.                                    476

(II) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel          477
by means other than secreting away in the goods and/or containers shipped by the Charterers,            478
the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel         479
is released and at their expense put up bail to secure release of the Vessel.                           480

                                                                                                        481
42. Smuggling                                                                                            482
In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any
fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof. 483

43. Commissions                                                                                         484

A commission of                          percent is payable by the Vessel and the Owners to            485
                                                                                                        486
                                                                                                        487
                                                                                                        488
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter. 489

44. Address Commission                                                                                  490

An address commission of                          percent is payable to                                491
                                                                                                        492
                                                                                                        493
on hire earned and paid under this Charter.                                                             494

45. Arbitration                                                                                         495

(a) NEW YORK                                                                                            496
All disputes arising out of this contract shall be arbitrated at New York in the following manner, and  497
subject to U.S. Law.                                                                                    498

One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their 499
decision or that of any two of them shall be final, and for the purpose of enforcing any award, this    500
agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with     501
shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of    502
Maritime Arbitrators Inc.                                                                               503

For disputes where the total amount claimed by either party does not exceed US $ **            504
the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society 505
of Maritime Arbitrators Inc.                                                                            506

(b) LONDON                                                                                              507
All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree    508
forthwith on a single Arbitrator, be referred to the final arbitration of two Arbitrators carrying on business 509
in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping,    510
one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No      511
award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as    512
above, unless objection to his action be taken before the award is made. Any dispute arising hereunder   513
shall be governed by English Law.                                                                        514

For disputes where the total amount claimed by either party does not exceed US $ 25000 **         515
the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime 516
Arbitrators Association.                                                                                 517

*(Delete para (a) or (b) as appropriate                                                                 518

The terms of this Charter Party shall be governed by English law. In the event of a dispute between the  519
parties they shall use their best endeavours to find an amicable solution. If the parties are unable to

35

resolve any such dispute or disputes amicably, all such dispute or disputes shall be reffered to arbitration in Singapore in accordance with the provisions of the Arbitration Act 1996 and prevailing rules of the London Maritime Arbitration Association. The defendant shall appointment his arbitrator within fourteen (14) days of the claimant appointing and notifying the defendant of the appointment of the claimant's arbitrator. If the defendant fails to appoint his arbitrator within the fourteen (14) days period the claimant's arbitrator shall become the sole arbitrator. When each party has appointed its own arbitrator, the two arbitrators shall be at liverty to appoint a third arbitrator only if the two arbitrators are not in agreement upon any one or all of the matters refered to the Tribunal.

Where the total amount in dispute is less than usd 50000,- such dispute shall be resolved under the LMAA's small claim procedure. If the parties are unable to agree upon the identity of a sole arbitrator, the claimant shall apply to the president for the time being LMAA to appoint a sole arbitrator.

| | | | |
|---|---|---|---|
| | | | 520 |
| If mutually agreed, clauses | to | , both inclusive, as attached hereto are fully | 521 |
| incorporated in this Charter Party. | | | |
| | | | 522 |
| | | | 523 |
| APPENDIX "A" | | | 524 |
| To Charter Party dated | | | 525 |
| Between | | Owners | 526 |
| and | | Charterers | 527 |
| | | | 528 |
| Further details of the Vessel: | | | |

Owners:                                    Charterers:


By:                                        By:
Title:                                     Title:

3b

RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
DATED DD/MM/YY

**Clause 46 – Vessel Description & Bunker Spec.**

See attached Vessel Particular

HFO grade - CST 180 RME 25
MDO grade – DMB grade
For bunker supplied in Far East Asia region, except for in Taiwan and / or Japan, MGO grade to apply.   During bunkering 3 samples will be taken by drip sampling from barge manifold. One to be retained by the vessel, one by Charterers / supplier and the third to be sent at Owners' cost for analysis if so desired. All samples to be sealed and signed by the Charterers / suppliers and the Chief Engineer.
Should any problems arise due to the quality of bunkers supplied, then a joint analysis to take place and findings to be binding on both parties

**Clause 47 – Cargo Hold**

Vessel's holds on arrival at first load port to be clean/swept/washed down by fresh water and dried and in every respect fit and ready to receive Charterers' intended cargo, being free of rust scale and previous cargo residues, should vessel fail hold inspection the vessel to be off hire from time of rejection until the vessel is fully passed and any proven expenses directly incurred for hold cleaning whilst vessel off hire to be for Owners' account. Furthermore Owners to immediately make any possible measures to ensure re-tendering of notice of readiness not later than agreed cancelling date.

**Clause 48 -- Certificates**

Owners guarantee vessel holding valid certificate of financial responsibility/international tonnage certificate during the entire charter party period.

**Clause 49 - Cargo Exclusions**

It is understood that the vessel is not to be employed in the carriage of :
ammonium nitrate (see below), asbestos, ashes, asphalt, bones, borates, borax, calcium carbide, cement in bulk, copra and it's products, direct reduced iron (DRI), ferro-silicon, fishmeal, hide, hot briquetted iron (HBI), injurious, inflammable or dangerous goods (such as acids, explosives, arms, ammunition or warlike materials, nuclear material or radioactive products or wastes or chemical products), livestock, motor blocks and turnings, motor spirit, naphtha, oilcakes and meals, petroleum or it's products (but petroleum coke allowed, see below), pitch in bulk, pond coal, pyrites, raw cotton, round logs, resin, scrap,
tabacco, tar or any of their products,

Cargoes listed in the IMDG Code should be subject to Owners' prior approval and to be loaded

-1-

37

RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
DATED DD/MM/YY

strictly in accordance with IMO and local rules and regulations.

Concentrates are permitted provided always loaded in line with IMO/local regulations.

Ammonium nitrate of Fertilizer grade to be allowed.

Charterers to have the option to carry one (1) voyage in total out cargo of salt and/or sulphur and/or green delayed and/or raw petroleum coke during each year period but sulphur or salt or petroleum coke not to be carried as last cargo under this time charter. It is agreed calcined petroleum coke to be generally allowed.

If vessel is carrying petroleum coke on the intermediate voyage of this Charter then Charterers to responsible the vessel with holds cleaned up to grain holds standard and no hold cleaning compensation falls due to Owners.

A) Prior to loading of salt or sulphur.
Depending on the standard of hold coatings to lime wash the holds
B) After discharging of salt or sulphur:
Sweep and wash down holds.
Rinse and flush bilges and bilge lines with fresh water.

C) In case crew are requested to do above works described in A) and/or  B) by Charterers, crew will render utmost assistance provided weather and time between last dischport and next loadport allows, as far as possible, without responsibility of the result, Charterers paying lumpsum of US$ 500.00 per hold for each operation for applying and US$ 500 per hold for removing respectively and in addition to normal hold cleaning bonus as agreed, but arrangement/time/expense including cost of material are always for Charterers' account.

Charterers are allowed to load pig iron but first layers of cargo (about 2 meters high) will be brought into holds slowly, carefully and as close as possible to vessel's tanktop to Master's satisfaction avoiding damage to her holds/natural bulkheads/tanktop/side tanks etc.

In case bagged cargo is carried, owners are not responsible for all  bags torn/shortlanded/damaged/leakage/pilferage except for ones wetted or other damage caused by vessel's unseaworthiness.

Clause 59 - Trading limits / exclusions

Vessel always to trade within I.W.L., Charterers' option breach of I.W.L. subject to Owners' underwriters approval and invoice, always afloat at any time of tide, ~~Charterers' option NAABSA~~, always via safe port(s)/berth(s) excluding:
Abkhazia, Angola, Cambodia, C.I.S. Far Eastern ports, Eritrea, Ethiopia, Georgia but the port of Poti is allowed, Great Lakes, Haiti, Lebanon, but Iraq will be allowed as soon as situation normalizes, Israel, Liberia, Libya, North Korea, Serbia, Somalia, Syria is allowed provided vessel is not flying Liberian flag, Yemen, Zaire; places subject to U.N. sanctions, areas prohibited by

-2-

*38*

## RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
### DATED DD/MM/YY

vessel's war risks underwriters due to war or war-like activities, and places which may be excluded by the authority of vessel's flag.

Cuba is included in the trading of the vessel but to be redelivered to the Owners free of any U.S.A. ban.

No direct trade between People's Republic of China and Taiwan.

### Pilotage

For trading to areas where pilotage is compulsory/ customary, the same to be on charterers account.   For trading to Orinoco River / Amazon River, the pilotage (including transportation cost) between pilot station and fairway although not compulsory, must be employed and paid by charterers.

For vessel entering U.S. ports, armed security guards may be hired on board as per USCG regulation; in such case, charterers are to be responsible for all the charges and related expenses for the hiring of guards.

### Asian Gypsy Moth

When Charterers direct the vessel to the area infested by Asian Gypsy moth , Charterers shall at Charterers' time and expense , undertake to arrange a certificate issued by an appropriate authority of such area / port certifying that the vessel is free from infestation by Asian Gypsy moth or its eggs and thereby owners shall not be held liable for any consequences at the next destined ports.

In case the vessel has traded at high-risk ports for Asian Gypsy Moth in Far-Eastern Russia or Japan within six months prior redelivery, Charterers shall arrange the inspection to obtain a quarantine proof certificate at their account.

### Clause 51 – ISM Clause

BIMCO STANDARD ISM CLAUSE FOR VOYAGE AND TIME CHARTER PARTIES

From the date of coming into force of the International safety management (ISM) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'The company' (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in this Charter Party, loss damage, expense or delay caused by failure on the part of the Owners or "the company" to comply with the ISM Code shall be for the Owners' account.

### Clause 52 – On-Deck Cargo

Deck cargo is allowed but same always loaded in accordance with vessel's deck respectively hatch cover strength and subject to Master's consent and satisfaction.

-3-

39

RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
DATED DD/MM/YY

Carried on deck without liability for loss or damage of whatsoever nature arising during carriage by sea, whether caused by unseaworthiness or negligence or any other cause whatsoever.

Charterers are responsible for all matters related to on-deck cargo including but not limiting to lashing/unlashing, secure/unsecure of the on deck cargo. Bill(s) of Lading covering deck cargo to be marked "Shipped on deck at Charterers'/Shippers'/Receivers' risk, time and expense. Owners, vessel not responsible for any loss, damage incurred".

For deck cargo to and from ports in USA, B/L covering deck cargo shall be incorporated : "Carried on deck at shipper's / charterers' / receivers' risk as the perils inherent in such carriage but in all other respects subject to the provisions of United States Carriage of Goods by Sea Act 1936"

Clause 53 – Cables / Victualling / Entertainment Clause

Charterers will remit to Owners with each hire payment a lump sum equivalent of USD 1,800 per 30 days or pro rata for the whole Time-Charter period. This payment shall be in consideration of:

All victualling as per Line 195 – 196.
Cost of incidentals such as cigarettes, drinks and petty expenses incurred by Master / Officers of the vessel on Charterers' behalf.
The cost of radio telegrams, telexes, fax and telephone communications made by the Master / Officers to the Charterers or their Agents or servants in direct performance of this Charter Party.

Clause 54 – Compliance with International Conventions

In the event of the vessel being prevented from or unable to perform in accordance with the terms of this Charter-Party by reason of:
a) Action on the part of relevant authorities resulting from non compliance with any compulsory applicable enactments enforcing all or part of any of the International convention in force.

b) Labour stoppages in services essential to the operation of the vessel owing to her flag or Ownership or management or the conditions of employment on board.

Any loss of time in the event a) and/or b) shall result in the vessel being off-hire and shall be dealt with in accordance with the off-hire Clause.

Clause 55 – Crew Work

Timecharter hire to include (overtime) expenses for nautical matter such as:

a)   Raising and lowering of derricks in preparation for loading and/or discharging

-4-

40

RIDER CLAUSES TO M/V "VESSEL/S NAME" CHARTER PARTY
DATED DD/MM/YY

b) Removing and /or replacing of beams in preparation for loading and/or discharging
c) Shifting operations, docking and bunkering (provided port & local regulations permit)
d) Maintaining power while loading and / or discharging and care for winches / cranes of operations

During this time charter period, Charterers to pay to crew directly for the allowance of the hatch cover operations & cargo holds cleaning as per Charterers' direct negotiation with crews.

Crews are NOT to perform any lashing / unlashing of cargo.
Crews are NOT to operate cranes / derricks / heavy lift gear during loading / discharging operations.

### Clause 56 - Fumigation / Watchmen

Owners to supply valid fumigation or Sanitary Control / Exemption certificates on delivery of the vessel and if this does not cover the whole period of time charter and fumigation/sanitization is necessary, the cost of same and the detention to be for Owners' account.

Fumigation ordered because of cargoes carried or ports visited while vessel is employed under this Charter to be for Charterers' account.

Watchmen, if compulsory / customary (particularly for African ports / South American Ports/ Russia ports) to be charterers' account; otherwise watchmen for cargo for charterers' account, watchmen for vessel for owners' account.

Normal immigration should be on Charterers' account. Immigration for crews embarking from ship including the application of shore passes to be on owners' account subject to Master's application.

When Charterers direct the vessel to ports in USA and / or Canada and /or other ports where applicable, to comply with local oil spill prevention regulations, owners to be responsible for annual fee. For each call, charges incurred for complying with such regulation (including reporting charge for complying with oil spill contingency plan) to be on charterers' account.

### Clause 57 - Black List

Owners guarantee that this vessel has never called at an Israeli port, and Charterers guarantee that the vessel will not call at any such port prior to or during the currency of this Charter.   Owners also guarantee that this vessel is not black-listed by any Arab Countries.

### Clause 58 - Preloading Survey

-5-

4

RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
DATED DD/MM/YY

If required by Owners' P&I Club, when loading steel products, the Preloading survey to be arranged by Owners P& I club, the cost will be shared equally between/among Owners, Charterers, and Sub-Charterers.

### Clause 59 - Fuel Sulphur Content Clause

"(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i)    the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii)    the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or

42

RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
DATED DD/MM/YY

national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

### Clause 60 - Option to sell

Owners to have the option to sell the vessel and change vessel's flag/name/Ownership/Management, provided they give sufficient notice to Charterers and that the new Ownership respects the present Charter Party, subject to Charterers' approval of new Owners which not to be unreasonable withheld.

### Clause 61 - Bottom Fouling Clause

In the event of the Charterers ordering the vessel to port(s) where vessel's stay is more than 15 consecutive days or to lay-up so as to avoid bottom fouling, Charterers to clean vessel at their time and expense, otherwise Owner's representation of vessel's speed/consumption to be non operative from the time of sailing from such port(s) until vessel's next dry dock, such fouling affecting speed to be evidenced through a joint diver's inspection. Cost for same to be for Owner's account and time to be for Charterer's account."

### Clause 62 Panama/Suez Canal Transit

The Owners guarantee that the vessel shall be fitted for Panama/Suez canal transit and in possession of valid necessary certificate and equipments (however, without the Suez Canal Projector light ) during the currency of this Charter to comply with current regulations and requirements of both Canals. If required, the Suez Canal Projector light, rent of same to be for Charterers account.

### Clause 63 - Owners' Bank Full Style

To be provided

### Clause 64 – Owners' Agents

Charterers agree to have their Agents to attend vessel's ordinary husbanding without any agency fee in conformity with normal shipping practice provided no extra agency fee to be required by each local Agents. If required by owners, charterers' Agents to attend extraordinary matters (like attending repairs, crew change etc.) in which case owners to refund Agents outlays and pay agency fee agreed between owners and charterers' Agents.

-7-

43

RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
DATED DD/MM/YY

### Clause 65 – Adding Off-Hire Period

Should the vessel be Off-Hired during the currency of this Charter for any reason whatsoever, Charterers have the option to add such off-hired period to the Charter period. Such option must be declared by charterers 3 months prior the redelivery date.

### Clause 66 – Burning MDO

The vessel has a liberty to burn diesel oil for main engine when maneuvering in shallow and/or narrow water, canals, rivers and in and / or out of port.  The vessel also has a liberty to burn diesel oil for auxiliary engine when starting, stopping and working with low load.

### Clause 67 – Dry Docking Clause

Owners shall have the option to place the vessel in drydock Atlantic or Far-East Asia during the currency of this Charter party at the convenient time and place to be mutually agreed upon between Owners and Charterers for bottom cleaning and painting and/or repair as required by class or dictated by circumstances.  However, the Owners shall notify the Charterers of the intention of such drydocking and/or periodical survey with 3 months prior notice except emergency case.   Charterers will try their best to bring the vessel to the Far East Area for the D/D if possible.

Vessel to be placed to Charterers disposal again at same commercial position or in a position that is not inferior for Charterers business compared to the position where she went offhire.

### Clause 68 – L.O.I. Clause

If the original Bills of Lading can not be presented at discharging port, Owners/Master agree to discharge/release the entire cargo without presentation of the original Bills of Lading only against Charterers' Letter of Indemnity in Owners' standard P and I club form and without bank guarantee or bank endorsement. Charterers' Letter of Indemnity to be faxed or e-mailed to Owners via broker channel before commencement of discharge and original to be received by Owners latest 2 days prior to discharge, otherwise owners will not be held liable for any delay of discharging operation.

### Clause 69 – Bill of Lading Reference

The Owners accept that Bills of Lading issued under this Charter Party might bear a reference to a Charter Party to which the Owners are not a party.   The Charterers hereby undertake to indemnify and hold harmless the Owners for any and all consequences following from the issuance of Bills of Lading by the Owners which bear such reference.

-8-

RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
DATED DD/MM/YY

Clause 70- Deviation / Put Back

In the event of loss of time either in port or at sea, deviation from the course of the voyage or putting back whilst on the voyage, caused by sickness of or an accident to or misconduct by Master/Officer/Crew, or caused by stowaway, refugee on board the vessel, or breakdown to vessel (or drydocking or periodical survey), the hire shall be suspended from the time of inefficiency in port or at sea, deviation or putting back    (except for any Government or similar authority ordered rescue operation) until vessel become again efficient in the same position or regain the line of voyage whichever shorter distance for the port where vessel is originally destined for and the voyage resumed therefrom, and all direct proven expenses incurred including bunkers consumed during such period of suspension shall be for Owners' account.

Clause 71 - Log fitted:-

~~The vessel is log fitted, equipped with stanchions, lashing chains. For all additional lashing materials not already on board in connection with carriage of logs to be supplied by and for Charterers' account~~

Clause 72 – Capture, Seizure, Arrest

Should the vessel be captured or seizured or detained or arrested by any authority or by any legal process during the currency of this Charter-Party, for any reason which affect cargo loading / discharging operation and vessel sailing / departure attributable to the Owners, the payment of hire shall be suspended until the time of her release, unless such seizured or detention  or arrested was caused by the cargo carried or associated with Charterers or their agents, servants.. Any extra proven expenses directly incurred by and/or during such capture or seizure or detention or arrest shall be for Owners' account.

Clause 73 – Additional Equipment, Fittings

The Charterers, subject to the Owners' approval shall be at liberty to fit / weld and additional equipment for fittings, for loading, discharging and/or securing cargo. Such work shall be done at the Charterers' expenses and time, and the Charterers shall remove such equipment and fittings at their expense and time prior to redelivery. The strength, location and fitting of additional fittings for cargo scouring to be approved by class and procedure for use to be entered into the Vessel's Class approved Cargo Securing Manual.

Clause 74 – Quarantine

45

RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
DATED DD/MM/YY

Normal quarantine time and expenses for the vessel's entering port shall be for the Charterers' account, but any time of detention and expenses for quarantine due to pestilence, epidemics and illness of Captain, Officers and crew shall be for the Owners' account. However if quarantine and/or detention is on account of the vessel having been sent by the Charterers to an infected port, such detention time and expenses to be for the Charterers' account.

### Clause 75 – Oil Spillage During Bunkering

a) If the Owners are required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawful to enter, remain in or leave any port, place, territorial or contiguous waters of any country or state in performance of this Charter Party, the Owners shall make all arrangements by bond or otherwise may be necessitated to satisfy such requirements at the Owners' sole expense.

b) The Charterers shall be under no responsibility for all consequences (including loss of time) of oil or other pollution damage and any failure or inability of the Owners to do so as provided for above and any loss of time incurred thereby to be off-hire.

c) The Owners shall indemnify the Charterers harmless against all consequences (including fines if any imposed to the Charterers) of oil or other pollution damage and any failure or inability of the Owners to do so as provided for in preceding Paragraph (a) above.

### Clause 76 – Boycott

In the event that the vessel is delayed by strikes, lockouts, labour stoppage or any other difficulties due to flag or Ownership of the vessel or due to the terms and conditions under which members of the crew are employed, hire shall cease for such time lost and all other consequences, liabilities and proven expenses directly incurred are to be for Owners' account, including bunker fuel consumed during such periods. Any extra insurance, if any, owing to vessel's age and/or class and/or management and/or flag, to be for Owners' account.

### Clause 77 – Deductions

Charterers will not deduct from hire payment for any estimated expense under this Charter-Party unless otherwise agreed by owners.  Owners agree Charterers to deduct from hire payment for all Owners' disbursements subject to supporting voucher. Charterers are at liberty  to deduct estimated value of bunkers on redelivery from last or penultimate hire payments.

### Clause 78 – I.T.F. Requirements

The Owners of the vessel guarantee that the minimum terms and conditions of the Officer / crew of the vessel are now or will be prior to presentation of the vessel for loading and will remain for the period of this Charter-Party covered by an I.T.F. Agreement or a bona fide Trade Union

46

RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
DATED DD/MM/YY

Agreement acceptable to the I.T.F.

Clause 79 – Owners guarantee that vessel is entered with a P. and I. Club

Charterers have the benefit of Owners' P. and I. Club as far as the Club's rules permit. Cargo claims are to be settled in accordance with the New York Produce Exchange Interclub Agreement 1996 and any subsequent amendments thereto.

Clause 80 – IMO

Vessel will comply with applicable IMO Regulations throughout the period of this Charter.

Clause 81 - Ballast

Owners undertake that the vessel can navigate safely in ballast without requiring solid ballast.

Clause 82 – War Risk Insurance

Basic annual war risk insurance premium on vessel's war risk value to be for Owners' account. Any extra or additional war risk insurance premium on vessel's war risk value and crew war bonus for trading to areas, in breach of war risk warranties to be for Charterers' account. Additional war risk premium shall be reimbursed by the Charterers to the Owners following receipt copy of the invoice and supporting vouchers from Owners underwriters or underwriters' brokers.

Clause 83 – Safety and Health Regulations

Owners warrant that the vessel shall be in possession of the necessary Certificates to comply with all Safety and Health Regulations concerning Health and Safety Requirements and all current requirements at all ports of call permitted under this Charter-Party during the currency of this Charter, without hindrance or delay.

Clause 84 – ISPS/MTSA Clause for Time Charter Parties 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and

-11-

47

RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
DATED DD/MM/YY

the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## Clause 85 – Cargo and Equipment

Owners undertake that throughout this Charter vessel's equipment shall comply with regulations and/or requirements in effect at all ports of call permitted under this Charter-Party, canals and countries in which vessel will be employed under this Charter-Party. Owners also undertake that vessel shall be at all times in possession of a valid and up-to-date certificate on board to comply with such regulations and/or requirements. If stevedores, longshoremen or other labourers are not permitted to work by reason of any failure of the Captain, Owners and/or their Agents to comply with such Regulations or by reason that vessel is not in possession of such valid and up-to-date Certificate(s), then Owners shall take immediate corrective measures. Charterers may suspend hire for time lost thereby and any extra proven expenses directly incurred shall be for Owners' account.

-12-

48

RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
DATED DD/MM/YY

### Clause 86 – Bunkering Privileges

Owners certify that the vessel is and will, remain so throughout the duration of this Charter, eligible of full bunkering privileges in the United States of America and its territories and possessions under all present and future United States Law and Regulations and is not, nor will be, restricted as to bunkering at any other countries of port of call during this Charter.

### Clause 87 – Weather

For the purpose of this Charter Party, good weather conditions are to be defined as weather conditions in headwind speeds not exceeding headwinds Beaufort Force 4 and sea state Douglas 3. Evidence of weather conditions to be taken from independent weather bureau reports and vessel's logs. In the event of consistent discrepancies between the deck logs and the independent weather bureau reports, the average of the two shall be taken as ruling.

### Clause 88 – Stevedore damage Clause

Charterers to be responsible for any damages caused by stevedores in loading and discharging and for any other damages caused by stevedores or their Agents provided that the Master obtain Statement of Facts or Damage Certificate signed by stevedores and/or their Agents. In the event that the Master is unable to obtain Statement of Facts or damage acknowledgement certificate signed by the stevedores and/or their Agents or if obtained but the Statement of Facts or damage acknowledgement certificate be remarked or annotated by the stevedores and/or their Agents repudiated responsibility or liability, the Master to report to Charterers and Owners the actual situation within 48 hours after the occurrence, otherwise Charterers shall not be held responsible for the damage and settlement to be made between Charterers and Owners through negotiation in accordance with the terms and conditions of this Charter-Party. The repairs to such damages are to be paid for by Charterers and are to be effective whilst the vessel is on hire, unless by mutual agreement, it is over sufficient minor nature to permit deferring the repairs until vessel's next periodical survey, regardless whether these repairs are considered to be or not to be as items of periodical survey, Charterers to refund the cost to Owners of such repairs against the presentation of repairs billed. If Owners sell the vessel without effecting such repairs, Charterers to refund the Owners' loss as a result of the damages leading to a lower sale price.

### ~~Clause 89 – Bunker & Condition Survey~~

~~A joint on hire bunker and full condition survey to be held at delivery port and a off-hire bunker and full condition survey to be held at redelivery port. Survey to be performed by an independent surveyor acceptable to both parties. The survey fee for the on-hire/off-hire bunker and full condition survey to be equally shared between Owners and Charterers. On hire survey on Owners' time, off-hire survey on Charterers' time.~~

-13-

49

RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
DATED DD/MM/YY

**Clause 90 – Double Banking clause**

Charterers have the privilege to double-bank the vessel. Vessel to be "Tendered" at Charterers' expense and to Master's satisfaction. Master have the privilege if deemed necessary for the safety or the vessel / operation to move from the mother / daughter vessel.

The charterers shall further indemnity the owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including period for repairs as a result of such operation

**Clause 91: Inventory of Charterers' Equipment**

~~The Master to keep a record of all Charterers gear, equipment and or stores supplied to the vessel and to maintain same in good condition. Such gear, equipment and/or stores to be redelivered to Charterers prior to redelivery of the vessel to Owners or, if requested by Charterers, at any time during the period of the Charter in like good order and condition as supplied (ordinary wear and tear excepted). Owners to make good any shortage and/or damage unaccounted for.~~

**Clause 92: Delete**

**Clause 93: Welding Padeys**
Charterers to have the option of welding pad eyes/angle pieces at their own arrangement and expense. Charterers to remove all pad eyes/angle pieces by redelivery unless Owners require Charterers to maintain same.

**Clause 94: BIMCO War Risks Clause for Time Charters, 2004 (Code Name: CONWARTIME 2004)**

(a) For the purpose of this Clause, the words:
(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
(ii) "War Risks" shall include any actual, threatened or reported: war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

-14-

50

## RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
### DATED DD/MM/YY

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and indemnity Risks), and the premiums and/or calls therefor shall be for their account.
(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty to:

(i) comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the

-15-

### RIDER CLAUSES TO M/V "VESSEL/S NAME" CHARTER PARTY
### DATED DD/MM/YY

Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier; to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

### 95. BIMCO Stowaways Clause for Time Charters .

(a)(i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(a)(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all

- 16 -

52

RIDER CLAUSES TO M/V "VESSEL'S NAME" CHARTER PARTY
DATED DD/MM/YY

expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(a)(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to subclause

(a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

(b)(i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.

(b)(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

### Cl. 96 Strike Clause

Ship not to be responsible for any loss , damage , or delay , directly or indirectly caused by , or arising from strikes, lockouts , labour disturbances , trade , disputes , or anything done in contemplation or further thereof , whether the owners be parties thereto or not.

53

# EXHIBIT B

# Lullang Wisdom S.A.

Rm. 91, 7th Fl., No. 237 Fu-Hsing S.Rd., Sec.2, Taipei 106, Taiwan
Tel: +886-2-27558911 Fax +886-2-27556655

Messrs.  Doomer Srl. Italy
address

**DEBIT NOTE**

19-Aug-2009

Vessel:  Lullang Wisdom

Hire No. Final Hire

The subject vessel was delivred to your company on 1230UTC 15th May, 2009 at Piraeus, Greece. According to the charterd parties dated 25 April 2009, the charter hire to be USD 9,700.00 daily and C/V/E USD1,250.00 monthly.

Debit Note No: LWJL05

| No. | Items | Amounts in US Dollar | |
|---|---|---|---|
| | | Debit | Credit |
| 1 | Charter Hire (1230UTC 14/5/2009 – 1900UTC 22/Jul/09) | | |
| | USD 9,700/day x 7.96000 days | 88,730.00 | |
| 2 | C/E/V in lumpsum (USD1,250 per month) | 329.17 | |
| 3 | Cleaning of Hold (V-1) | | |
| | USD 500/hold x 4 holds | 2,000 | |
| 4 | 2.5% Address commission | | |
| | 2.5% x USD 88,730.00 | | 1,718.25 |
| 5 | 1.25% commission to Mare Nostrum Srl | | |
| | 1.25% x USD 86,730.00 | | 859.13 |
| 6 | Owner's disbursement | | |
| | Doctor fees for Mr.Liu DO Euro 200.00 | | 364.00 |
| | Crew shore pass Euro 73.00 | | 132.00 |
| 7 | Bunker ROB as of 22nd Jul 1900UTC | | |
| | FO 242.56/MT x 290.00 USD | | 70,342.40 |
| | DO  35.90/MT x 460.00 USD | | 16,532.00 |
| 8 | Outstanding 4th hire | 126,231.25 | |
| | **Total** | 197,290.42 | 90,017.93 |
| | **Balance due to Owners** | US$107,272.44 | |
| | **G. Total** | 197,290.42 | 197,290.42 |

Please remit the above amount to our nominated account as hereunder.
Our banking details are as following:

| Beneficiary: | Wisdom Marine Lines S.A. |
|---|---|
| A/O No: | 092-101013-726 |
| Bank: | LAND BANK OF TAIWAN |
| | HSIN YI BRANCH |
| | TAIPEI, TAIWAN, R.O.O. |
| Swift Code: | LBOTTWTPO79 |

We much appreciate to have your confirmation when remitance affected, we remain,

Yours faithfully,
Wisdom Marine Lines S.A.

Ching-I, Liu
On behalf of Owner

# EXHIBIT C

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
WISDOM MARINE LINES S.A.
366 Main Street
Port Washington, New York 11050
Tel:   (516) 767-3600
Fax:  (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

WISDOM MARINE LINES S.A.,

                              Plaintiff,

                                                                 09 CV _____ (___)

            v.
                                                                 **ATTORNEY'S DECLARATION**
DOPMAR SRL,                                                      **THAT DEFENDANT**
                                                                 **CANNOT BE FOUND**
                                                                 **WITHIN THE DISTRICT**

                              Defendant.
------------------------------------------------------------------X


        This declaration is executed by the attorney for the Plaintiff, WISDOM MARINE

LINES S.A. (hereinafter "WISDOM"), in order to secure the issuance of a Summons and

Process of Attachment and Garnishment in the above-entitled, *in personam*, Admiralty

cause.


        Pursuant to 28 U.S.C. § 1746, George E. Murray, declares under penalty of

perjury:

        1.      I am an associate at the law firm of Chalos, O'Connor & Duffy LLP

representing Plaintiff WISDOM in this case.

2.      I have personally inquired or have directed inquiries into the presence of the Defendant DOPMAR SRL in this District.

3.      I have personally checked with the office of the Secretary of State of the State of New York, using the Secretary of State's Division of Corporations database, and I have determined that, as of September 23, 2009, the Defendant DOPMAR SRL is not incorporated pursuant to the laws of New York, is not qualified to conduct business within the State of New York and has not nominated agents for the service of process within New York because the Secretary of State of the State of New York has no records for the Defendant DOPMAR SRL.

4.      I have inquired of Verizon Telephone Company whether the Defendant DOPMAR SRL can be located within this District.  The Verizon Telephone Company has advised me that the Defendant does not have any telephone number listings within this District.

5.      I have further consulted with several other telephone directories on the internet, and I have found no telephone listing or address for the Defendant DOPMAR SRL within this District.

6.      I have further made several searches on the Internet with various search engines and maritime websites, and I have found no indication that the Defendant DOPMAR SRL can be found within this District.

7.      In that I have been able to determine that the Defendant is not based in the District and that I have found no indication that the Defendant can be found within this District, I have formed a good faith belief that the Defendant does not have sufficient contacts or business activities within this District to defeat maritime attachment under

Rule B of the Supplemental Rules for Admiralty or Maritime Claims as set forth in the Federal Rules of Civil Procedure.

     8.    It is my belief, based upon my own investigation that the Defendant cannot be found within this District for the purposes of Rule B of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure.

     I declare under penalty of perjury that the foregoing is true and correct.

Dated: Port Washington, New York
     September 23, 2009

     CHALOS, O'CONNOR & DUFFY, LLP
     Attorneys for Plaintiff,
     WISDOM MARINE LINES S.A.

By: _____
     George E. Murray (GM-4172)
     Owen F. Duffy (OD-3144)
     366 Main Street
     Port Washington, New York 11050
     Tel: (516) 767-3600
     Fax: (516) 767-3605